## GRAND LODGE A. O. U. W. v. MILLER.

### IN THE MATTER OF THE ESTATE OF MATILDA PEACOCK, DECEASED.

[No. 18; decided May 8, 1907.]

**Death—Presumption of Survivorship.**—Where a husband and wife perish in a common calamity, such as an earthquake, both being between the ages of fifteen and sixty, he is presumed to survive her.

Interpleader to have the court determine who is entitled to $1,000 due under a policy or beneficial certificate issued to William Peacock.

William Peacock held a beneficial certificate issued by plaintiff, by which it agreed to pay his beneficiaries the sum of $2,000 upon his death. He nominated his wife, Matilda F. Peacock, his beneficiary. The constitution and by-laws of plaintiff provided that upon the death of a designated bene-

ficiary, in default of a new appointment by the holder of a certificate prior to his death, then upon the death of the holder of such certificate, the amount should be paid to the children of such deceased, share and share alike.

Both William Peacock and Matilda F. Peacock were killed at Santa Rosa in the great earthquake disaster on the morning of April 18, 1906, while at the Occidental Hotel, which was razed to the ground. They left surviving them their daughter, Ada Baptist; and William Peacock left surviving him Ida Miller, a daughter by a former marriage. These two daughters are the only surviving children of William Peacock, deceased, and Ada Baptist is the only surviving child of Matilda F. Peacock, deceased.

The plaintiff issued two drafts for $1,000, one payable to Ada Baptist, the proceeds of which she has received; the other payable to Ida Miller. The draft which was made payable to Ida Miller was not delivered to her. The amount was and is claimed by Ada Baptist, as executrix of the estate of her mother, Matilda F. Peacock, deceased. In other words, Ada Baptist received $1,000 of the amount due ·by reason of her father's death, and claims that her sister of the half-blood should receive nothing from the beneficial certificate, but that the other $1,000 belongs to the estate of her mother. Her claim is based upon· the contention that her mother survived her father, and hence that immediately upon the death of her father the amount became due by plaintiff to her mother.

The evidence shows that the bodies of both William Peacock and his wife were found by a rescuing party about 9 or 10 o'clock on the morning of the earthquake, after removing the debris, timbers and mortar, on the same bed in the room in which they had retired the night before, cold in death, and that there was mortar and debris on the bed and over the bodies. There is evidence to the effect that his body was lying flat in bed with one hand under the back of his head; that there was a cut near his temple; that his skull was crushed; that he had a wound in his stomach; that the bedclothes were off his shoulders and off part of one side of his body; that the bedclothes were off, or rather, at the foot of the bed on the side where Mrs. Peacock lay; that one of her

legs was out over the side of the bed; that her body was pretty badly bruised; that there was mortar through her hair, under her eyelids and in her nostrils; that there was a watery substance or foam in her mouth; that her face and body were somewhat discolored. Ada Baptist and her husband, Joseph Baptist, each testified that when they saw Mrs. Peacock's body ten days after death, when she was buried at Petaluma, her hair was gray from a quarter to half an inch from the scalp, extending from the forehead pretty much over the entire scalp. Ida Miller testified that about three weeks before the death of Mrs. Peacock she saw her sister, Ada Baptist, putting some hair restorer on Mrs. Peacock's hair. John Peacock, a brother of William Peacock, deceased, testified that he saw the body of Mrs. Peacock the next day after the earthquake, and that he noticed no difference in the color of her hair after death from what it was before. None of the witnesses who assisted in taking out the bodies on the morning of the earthquake testified as to any rim of gray hair near the scalp.

W. F. Williamson, for Grand Lodge A. O. U. W.

For Miller and others, Bishop & Hoefler, L. F. Hart and A. A. Sanderson.

COFFEY, J. The presumptions are all in favor of the survivorship of the husband in such a case as this. I think the statute is pretty plain upon that. The California statute is but an expression of the law as it existed in the Roman law and the civil law. We will look at the statute for a moment—section 1963, subdivision 40, of the Code of Civil Procedure:

"When two persons perish in the same calamity, such as a wreck, a battle, or a conflagration, and it is not shown who died first, and there are no particular circumstances from which it can be inferred, survivorship is presumed from the probabilities resulting from the strength, age and sex, according to the following rules: . . . .

"Fourth—If both be over fifteen and under sixty, and the sexes be different, the male is presumed to have survived."

*Now, is there any evidence to rebut these presumptions?*

There is something in the evidence here about the wife's hair turning gray. The argument from which, I understand, is that that is an evidence of survivorship, because the hair must have turned gray by sheer fright or suffering on account of the calamity, fright and suffering being suggestions of vitality.

On the other hand, there is also evidence here that there had been a solution used on the wife's hair to restore the original color and to obscure the evidence of grayness, which would probably counteract any argument that might be based upon this fright or suffering turning the hair gray. It is also in the proof that there were streaks of gray hair there. There is some testimony that it was in rather a ragged rim, about a quarter to half an inch above the temple. One of the witnesses testified it was just above the temple that it turned gray. That was not the original color. There is also testimony from a source which ought to know, that the wife's hair was gray before she went to Santa Rosa, and had been gray for some time, and that that was a common characteristic of both herself and her sister. It is not necessary to disparage the witnesses here, nor to discredit Stearns or Townsend, but the extent of their acquaintance with the deceased husband and wife, as well as that of Gilliam, may be called in question. Gilliam did not know the decedents at all, except by sight; once or twice he saw Mr. Peacock. He was not acquainted with him. Wilcox, on the other hand, was very well acquainted with him, and had been his particular friend and associate, and had been with him until very late at night and early in the morning on the night and day preceding the earthquake.

Those persons who saw the two bodies after death did not testify with any certainty or with any positiveness. Their testimony is meager and somewhat vague, and is not of that degree of positiveness that entitles it to be considered evidence which should rebut the statutory presumption which gives to the male and the elder and the stronger person the inference of survivorship. The male is presumed to survive the female; the elder to have survived the younger; the stronger to have survived the weaker.

Now, what are the facts in this case, with respect to the support of these presumptions? This lady was frail physically, was some thirteen or fourteen years younger than the husband, weighed about one-half his weight. The evidence is that she weighed, one witness said eighty or ninety, another witness says about eighty-five, and another, one hundred and one, one hundred and fifteen to one hundred and twenty-five. The other witnesses say she was delicate, or, at least, "frail" is the word that was used; slight, slender, infirm, light in weight. The husband was a man robust and strong, weighed two hundred pounds, was of the age of fifty-six, in the prime of life as far as age was concerned. He had no trouble physically, except that it was suggested he had a slight stomach ailment. As far as physical health was concerned, both the legal presumption, the presumption of law, as stated in the statute, and also the presumption of fact, would be entirely in favor of his survivorship. He was under sixty. If he were over that age the presumption would be otherwise. But he was under sixty—several years under. I do not see any facts in this case that were shown by the testimony of Mr. Stearns, or Mr. Townsend, or Mr. Gilliam, that would weigh at all against these presumptions, that could be considered even if there were no legal presumptions against the presumptions of fact. I do not think that there is any case in the books that would justify me in saying anything to the contrary. The case of Sanders v. Simcich, 65 Cal. 50, 2 Pac. 741, does not seem to be analogous to this. The Estate of Helena Howard (tried in this Department and reported in the San Francisco Law Journal of September 14, 1896), to which I referred the other day, was the case of two persons who were quite well advanced in life—they were both over sixty. As to the case of Hollister v. Cordero, 76 Cal. 649, 18 Pac. 855, Mr. Williamson says there were no facts in that case. I did not read the case exactly as he does in that respect. There was evidence in the case.

Mr. Williamson: In that case they found the body of one in the yard and the other in the house, and the court held there was nothing to indicate from the mere fact that one was in the yard that necessarily he had survived. He might have been killed first in the yard.

The Court: Yes, sir.

Mr. Williamson: They say, I think they use these terms, when there is nothing to show which died first, the theory is that where, as here, that condition exists, the presumption ceases to exist and it becomes a question of the weight of evidence, and upon that statement of facts the judgment is asked for.

The Court: The supreme court said, in Hollister v. Cordero, that the evidence is without conflict, so there was evidence there. Now, it undertakes to give the substance of the evidence. It does say that there is nothing to show which one expired first, and then it proceeds to deal with the probabilities arising from the evidence as to which one might have expired first, and then it discards the evidence altogether, the evidence as far as the facts are concerned, and deals only with the presumptions.

In this case there is not, in my judgment, any evidence to show that this lady survived her husband. They both experienced the effect of a common shock. There was nothing to show that there was any particular writhing or torment, or any movement of the limbs of the body after the earthquake occurred. Townsend testifies as to something that might be frothing at the mouth, or saliva, or something exuding—at least he says something to that effect. Some mortar was deposited seemingly under the eye, and some lime, or something of the kind, under the lids. That particular testimony was, I must say, rather a suggestion of the examiner than the original and independent testimony of the witness. It was Mr. Williamson that suggested that this was under the eyelids, and the witness assented to that.

Mr. Williamson: I think, your honor, he spoke of it in the eye, and that the question was whether it was under the eyelids.

The Court: It might have been deposited in the eye. Of course, when the building collapsed, there was some debris, some portions of the mortar or cement—there were no bricks, as far as could be seen. Mr. Peacock had the side of his head crushed, it seems. It does not seem, however, that death immediately ensued, nor does it seem that there was a complete fracture. Townsend said first, the skull was cracked,

that there was a crack there. Then I asked him if there was a fracture, but he did not assent to that. He said it was a gash and it seemed to penetrate to the bone. The gash might have penetrated to the bone without the skull being fractured. There is a great difference there. So, as far as that is concerned, there is no evidence.

Mr. Williamson: The next question brought out the fact from the witness that the bone was crushed in.

The Court: Well, hardly so. I do not know that it is necessary to refer to the notes for that. He said there was a deep gash there, about two and a half inches deep, that it went to the bone. The point is that it did not seem that death was naturally inferable as immediately consequent upon that wound. He might have survived that wound for some time. There was testimony of the deputy coroner, speaking from his experience with bodies—it was not particularly noticeable how far his experience extended—that the man had died from smothering. No doubt he did. No doubt the lady died also from that species of asphyxiation. Both conclusions are probable. That helped them both, as far as causing death was concerned. But I do not think that there is evidence, that I can regard as such, that shows that this lady survived her husband. The presumptions are very strong against that conclusion. As far as I can judge the evidence now, I shall say that Mr. Peacock survived his wife.

The court will make an order denying the application of Mrs. Baptist for partial distribution, and giving judgment in favor of the defendant, Ida Miller, in the case of Grand Lodge v. Miller et al.

---

The Principal Case was before the court of appeals in 8 Cal. App. 25, 96 Pac. 22. See the note on presumption of death to Estate of Kustel, 2 Cof. Pro. Dec. 3.